**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**Civil Action No. 14-cv-3511**

**CHESAPEAKE ENTERPRISES, INC.**

       **Plaintiff,**

vs.

**ONLINE CONSUMERS NETWORK, STEPHEN COLE KIMBALL, and DEL KIMBALL,**

**Defendants.**

_____

**COMPLAINT**

_____

Plaintiff Chesapeake Enterprises, Inc. ("Chesapeake"), through its undersigned counsel, files this Complaint against Defendants Online Consumers Network ("OCN"), Stephen Cole Kimball ("Cole") and Del Kimball ("Del") (collectively "Defendants"), alleging as follows:

**NATURE OF THE ACTION**

1.     This is an action to recover at least $575,000 that Defendants failed to pay Chesapeake for services rendered, as well as to recover damages based on Defendants' conspiracy and scheme to defraud Chesapeake out of hundreds of thousands of dollars.

**PARTIES**

2.     Chesapeake is a corporation, in good standing, organized under the laws of the District of Columbia with its principal place of business at 1255 25th Street NW, Suite 901, Washington, DC 20037.

3.      OCN is a non-profit corporation, not in good standing, organized under the laws of Colorado with its principal place of business at 725 S. Emerson Street, Denver, CO 80209.

4.      Cole is a natural person maintaining an address at 725 S. Emerson Street, Denver, CO 80209.

5.      Del is a natural person maintaining an address at 5501 High Drive, Mission Hills, KS 66208.

## JURISDICTION AND VENUE

6.      Chesapeake, OCN, Cole and Del are completely diverse from each other with regard to citizenship.

7.      Chesapeake is a citizen of the District of Columbia because it was incorporated in the District of Columbia and its principal place of business is in the District of Columbia.

8.      OCN, an entity not in good standing, is or was a citizen of Colorado because it was incorporated in Colorado and because its principal place of business is or was in Colorado.

9.      Cole is a citizen of Colorado because his residence is in Colorado.

10.     Del is a citizen of Kansas because his residence is in Kansas.

11.     All parties had substantial business contacts within the District of Colorado as it pertains to the subject matter of this lawsuit.

12.     This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331 as a federal question has been raised and pursuant to 28 U.S.C. § 1332 as complete diversity exists between the parties.

13.     Venue is appropriate in this Court under 28 U.S.C. § 1391.

14.     The amount in controversy exceeds $75,000.

- 2 -

## FACTS COMMON TO ALL ALLEGATIONS

15.     Chesapeake incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set out herein.

### A. Background of Parties and Payday Loan Industry

16.     Chesapeake is a consulting firm specializing in federal and state legislative, regulatory, government and public affairs matters.

17.     Chesapeake's chairman, Scott Reed, is a highly respected, experienced industry veteran who served as the campaign manager for a nominee in a presidential election, the executive director for a major national political committee, a director for the selection of a vice presidential nominee, and the chief of staff to the Secretary of the Department of Housing and Urban Development.

18.     Reed has appeared on NBC's Meet the Press, CBS's 60 Minutes and Face the Nation, ABC's World News Tonight, C-Span's Washington Journal, CNN's Capital Gang, CNBC's Capital Report, National Public Radio and other national broadcast programs. He is quoted extensively on national political trends in The Washington Post, The New York Times, USA Today, The Wall Street Journal and Time Magazine.

19.     Because of his expertise, experience and industry knowledge, Reed advises members of Congress, governors, and other members of the government on political and policy matters. Reed has been a guest lecturer at the John F. Kennedy School of Politics at Harvard University.

20.     Because of the unique nature of Reed's knowledge, experience and expertise, Chesapeake is ideally suited to provide services to clients in the payday loan industry.

21.     Payday loans are short-term unsecured loans that are sometimes referred to as cash advances. Payday loans are typically characterized as short-term, high-fee, unsecured loans, often made to consumers to provide funds in anticipation of an upcoming paycheck. The payday loan industry is highly lucrative business with loan volumes of more than $25 billion per year with at least $3 billion in annual fees.

22.     Defendants are involved in the payday loan industry.

23.     At all times relevant to this action, Defendants, acting alone or in concert with others, have marketed, offered, serviced, made, or collected payday loans throughout the United States and abroad. Defendants operate and/or operated a multitude of enterprises and businesses under numerous business names, incorporated names, unincorporated names, LLCs, trade names, hedge funds, investment funds, holding companies and d/b/a names. Defendants operate businesses in Russia, among other foreign countries.

24.     Since the financial crisis of 2008, the payday loan industry has faced intense scrutiny from regulators, state and federal legislatures, state and federal attorneys general, district attorney's offices, state's attorney's offices, United States Attorney's offices and multiple administrative entities.

25.     Many reasons exist for the intense scrutiny of the industry. For example, APR rates associated with payday loans can be substantially higher than standard revolving credit rates, payday loans disproportionately affect lower-income individuals, and widespread problems with disclosures to borrowers have been reported.

26.     Compliance is a major issue in the payday loan industry, as payday loans require mandatory disclosures and compliance with state and federal law (*e.g.*, Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)). Presently, fourteen states have banned

payday-loans altogether and nine other states have placed substantial restrictions and regulations on the industry.

27. The industry has been rapidly changing, as online operations have largely supplanted traditional reliance on storefront operations.

28. The intense government scrutiny, increased regulations, heightened competition, and shifting commercial landscape challenged and threatened the existence of Defendants' lucrative payday loan businesses in the United States and abroad. Defendants sought an experienced industry veteran to advise, counsel and advocate on their behalf.

29. As a result, Defendants engaged Chesapeake.

### B. Defendants Engaged and then Defrauded Chesapeake

30. Chesapeake's services, by their nature, are substantially confidential and proprietary. In summary and as it relates to this matter, the services Chesapeake provided to Defendants include, but are not limited to, the following: analysis and strategic counseling regarding Defendants' business operations and compliance with a multitude of regulations in various jurisdictions; intelligence gathering on behalf of Defendants from key sources in Washington, DC and in multiple states; strategizing with Defendants regarding critical information and strategic guidance related to political risks and opportunities in Washington, DC and in various states; and, strategic advocacy in support of Defendants' interests in multiple contexts, states, forums and venues.

31. Defendants' business relationship with Chesapeake dates back to 2009. As it relates to balance owed in this action, Defendants engaged Chesapeake's services beginning in December 2011, pursuant to an agreed-upon flat monthly fee referred to as a "retainer."

32.     The initial monthly retainer was $35,000 for December 2011 and $40,000 for January 2012. To accommodate Defendants, Chesapeake reduced its monthly retainer to $25,000 beginning in March 2012.

33.     On March 2, 2012, Chesapeake sent Defendants a written engagement letter memorializing the $25,000 monthly retainer. The parties' engagement letter is attached as **Exhibit A**. Defendants accepted the contract, ratified it through statements and conduct, and Defendants accepted it by performance.

34.     Defendants were historically a "slow-pay" account, throughout the parties' course of dealing. Defendants' payments were due on the first day of the month following each prior month billed, but Defendants never made timely payments throughout the parties' course of performance.

35.     For example, Defendants made a $75,000 catch-up payment on September 10, 2012 for services rendered in December 2011 and January 2012. Defendants made a $50,000 catch-up payment on November 20, 2012 for services rendered in February and March 2012. Defendants made a $95,000 catch-up payment on December 31, 2012 for services rendered in the spring and early summer of 2012. All parties were aware that the payments Defendants made in the latter part of 2012 were catch-up payments. Defendants' statement of account between July 2012 and May 2014 is attached as **Exhibit B.**

36.     Chesapeake afforded Defendants substantial latitude in terms of extensions of the due-date on Defendants' payments because Defendants represented that payment would ultimately be made as long as Chesapeake was patient in waiting for Defendants' belated catch-up payments.

605910 v5

37.     Chesapeake extended the due-date for Defendants' monthly payments and abstained from legal action in reliance on a series of misrepresentations made by Defendants. Defendants' representations regarding their intent to pay Chesapeake were false, deceptive and part of a scheme to defraud Chesapeake.

38.     Defendants repeatedly misrepresented to Chesapeake that their payment was forthcoming, that Chesapeake should be patient and that Chesapeake should continue to render services to Defendants pursuant to the $25,000 flat fee monthly retainer agreement. Defendants' misrepresentations were specifically designed to defraud Chesapeake, harm Chesapeake, benefit Defendants, wrongfully extract vital information from Chesapeake, and to prevent Chesapeake from working for any of Defendants' competitors in a highly competitive industry.

39.     To effectuate this wrongful and tortious conduct, Defendants engaged in an intentional pattern of conduct designed to string Chesapeake along under the auspices that Defendants' payments were forthcoming or imminent. While Defendants made false representations to Chesapeake regarding their intention to make payment, Defendants continued to reap benefits from Chesapeake's services, expertise and advocacy. At the same time, Defendants' actions caused substantial harm to Chesapeake and Chesapeake's business due to the loss of $575,000 in revenue and the opportunity cost of alternative work foregone.

40.     The parties' engagement agreement provided that the parties' relationship was to be indefinite in duration and could be terminated upon 30 days written notice. Defendants never provided any written notice of cancellation.

41.     Outstanding billing and unpaid balances related to this action correspond to the 23 months beginning July 2, 2012 and extending through at least May 1, 2014. Chesapeake's

- 7 -

monthly retainer was $25,000 from July 2, 2012 through May 1, 2014. The amount owed based on these 23 months of billing is $575,000.

42.     Defendants consistently and repeatedly represented through statements and actions that they intended to pay Chesapeake for the services Chesapeake rendered, beginning in July 2012, throughout 2013, and into 2014.

43.     On multiple occasions, Chesapeake offered to resign if Defendants no longer desired Chesapeake's services or if Defendants were not going to make payment. In response to Chesapeake's offers to resign if payment was not forthcoming, Defendants continued to represent to Chesapeake that they would make payment and Defendants implored Chesapeake to continue rendering services.

44.     Defendants were unquestionably aware that Chesapeake was engaged, and continued to be engaged on a $25,000 monthly flat fee retainer from July 2, 2012 through May 1, 2014. During this time, Defendants engaged in repeated instances of tortious and wrongful conduct.

45.     Cole and Del, who are brothers, formed an agreement, as part of a conspiracy among Defendants, and Defendants implemented a scheme on or about July 2, 2012. The agreement and scheme extended through at least May 1, 2014. Pursuant to the agreement and scheme, Cole was the "front-man" for Defendants and Cole was Chesapeake's point of contact. As the front-man and pursuant to the agreement, scheme and conspiracy among Defendants, Cole made a series of intentional misrepresentations to Chesapeake designed to mislead Chesapeake into believing that it would be paid. Defendants' representations were false, and they were known to be false when made because Defendants never intended to actually pay Chesapeake. Defendants' misrepresentations were designed to cause Chesapeake to continue

- 8 -

working for Defendants, in the absence of payment, in order for Defendants to unfairly and inequitably extract additional benefits from Chesapeake. Defendants knowingly caused harm to Chesapeake as a result of their misrepresentations.

46.     Defendants' actions were the classic example of a bait and switch. Defendants baited Chesapeake into performing services on their behalf and abstaining from representing Defendants' competitors; meanwhile, Chesapeake shared critical industry information and advised Defendants faithfully as if Defendants were Chesapeake's clients. Chesapeake took these actions as a result of Defendants' misrepresentations that they would pay Chesapeake for the services that Chesapeake performed. Defendants falsely represented, on multiple occasions, that Chesapeake would be paid.

47.     Around the middle of the year in 2014, Defendants switched tactics by becoming silent and Defendants stopped communicating with Chesapeake. Defendants' second deceptive tactic, "radio silence," left Chesapeake twisting in the wind. Unclear regarding the fraud that was being perpetrated by Defendants, Chesapeake sent multiple letters to Defendants in an effort to recover the $575,000 balance owed. Defendants did not extend the courtesy of a response to Chesapeake's letters.

48.     As a result of Defendants' wrongful scheme and series of misrepresentations from July 2, 2012 through May 1, 2014, Chesapeake abstained from engaging other clients or competitors in the payday loan industry. Defendants' subsequent silence and refusal to communicate was another act of deception. Because Chesapeake was engaged by Defendants, Chesapeake did not represent other clients with interests that would be adverse to Defendants' interests. Chesapeake abstained from commercial opportunities that would be inconsistent with the advocacy Chesapeake effectuated on Defendants' behalf and at Defendants' direction. As a

605910 v5

result of Defendants' wrongful conduct, Chesapeake sustained substantial damages in the form of lost revenue, lost opportunities and the opportunity cost of other commercial actions.

### C. Details Regarding Defendants' Scheme to Defraud Chesapeake

49.     Defendants conspired and implemented a nefarious scheme with the specific intent of defrauding Chesapeake into tendering its vital services. Meanwhile, Defendants intentionally strung Chesapeake along with a carefully orchestrated pattern of misrepresentations designed to make Chesapeake believe that it would be paid by Defendants pursuant to the parties' $25,000 per month retainer agreement. In fact, however, Defendants had no intention to pay Chesapeake for its services rendered from July 2, 2012 through May 1, 2014 and Defendants' representations that Chesapeake would be paid were false and deceptive.

50.     For example, on August 28, 2013, pursuant to and in furtherance of Defendants' agreement, scheme and conspiracy, Cole represented the following in response to Chesapeake's inquiry about when payment would be made:

> Not today [regarding payment to Chesapeake]. They [business associates and enterprises operated by Defendants] are in Kiev. **Should be back Friday**. Cole Kimball

**Exhibit C** (emphasis added).

51.     On September 9, 2013, pursuant to and in furtherance of Defendants' agreement, scheme and conspiracy, Cole represented:

> Hey Scott – I wanted to update you on the latest with Del. They [business associates and enterprises operated by Defendants] left Sunday to go back to Kiev to close the deal.  They should be back in the next week or so.  Keep in mind this is a $8 billion euro deal and it's quite complicated to move that kind of money around the world. There are literally dozens, if not more, of lawyers, financial experts, compliance officers/experts and politicians involved in the deal. **Thanks for your patience on the matter** [of Chesapeake receiving payment from Defendants].  I'll let you know the second I hear something.  Thanks.  Cole Kimball

**Exhibit D** (emphasis added).

52.     On October 9, 2013, pursuant to and in furtherance of Defendants' agreement,

scheme and conspiracy, Cole represented:

> Hey Scott – **Sorry for the delay**.  I'm here. Waiting on updates [regarding payment to Chesapeake]. They [business associates and enterprises operated by Defendants] were in Kiev and London for a month. Obviously a lot going on with the FDIC actions against the industry.  Soon as I hear something [regarding payment to Chesapeake] I'll give you a ring.  Cole Kimball

**Exhibit E**.

53.     On October 25, 2013, pursuant to and in furtherance  of Defendants' agreement,

scheme and conspiracy, Cole represented:

> Hey Scott – That's weird [regarding my full voice mailbox]. What number did you call?  **I'm hoping to have good news** [regarding payment to Chesapeake] for everyone next week.  The waiting game is killing me too.  Let's talk on Monday.  Send me some time options.  Thanks.  Cole Kimball

**Exhibit F** (emphasis added).

54.     On October 29, 2013, pursuant to and in furtherance of Defendants' agreement,

scheme and conspiracy, Cole asked for an accounting and continued to represent that he was

"doing [his] best to get the matter [of payment to Chesapeake] resolved:"

> Hi Scott – Can you provide me with an updated spreadsheet [regarding the amount owed to Chesapeake] like the one attached for 2013? I know there were some payments made to Chesapeake earlier this year for 2012 payments.  I need to reconcile the books. The guys are still out of town, they are back tonight.  Once I have a chance to speak with Del I'll call you with an update.  **Doing my best to get the matter** [of payment to Chesapeake] **resolved**.  Many Thanks.  Cole Kimball.

**Exhibit G** (emphasis added).

55.     Later on October 29, 2013, pursuant to and in  furtherance of Defendants'

agreement, scheme and conspiracy, in response to Chesapeake's confirmation that $400,000

was owed at that time, Cole represented:

> Okay. I thought we sent you some payments in 2013 for 2012?  Is that not accurate?  I thought we sent you at least $100K this year for 2012.  Thanks.  Cole Kimball.

**Exhibit H**.

56.     On October 29, 2013, in response, Chesapeake confirmed that that it "triple checked" and that $400,000 was owed as of that date.  **Exhibit H**.

57.     On October 31, 2013, Chesapeake checked in with Cole and Defendants by asking "was my $$ report ok to you?? match up?? Thanks."  **Exhibit I.**

58.     On November 26, 2013, Defendants continued to acknowledge the balance owed to Chesapeake and Defendants persisted with their agreement, scheme and conspiracy to defraud Chesapeake by representing that payment to Chesapeake was forthcoming:

> Have a great Thanksgiving.  **Hoping for great news** [regarding payment to Chesapeake] **next week**. Cole Kimball.

**Exhibit J** (emphasis added).

59.     On December 17, 2013, pursuant to and in furtherance of Defendants' agreement, scheme and conspiracy, Cole represented:

> Hopefully not [a lack of payment at Christmas time]. They [business associates and enterprises operated by Defendants] are still out of the country.  **Should be back this week.  I'll keep you posted** [regarding payment to Chesapeake]. Cole Kimball.

**Exhibit K** (emphasis added).

60.     Defendants' illegal scheme continued in 2014. Defendants continued to make misrepresentations in furtherance of their agreement, scheme and conspiracy to defraud Chesapeake on January 3, 2014:

> Hey Scott – Hope you had a Merry Christmas and Happy New Year.  **Still playing the waiting game** [regarding payment to Chesapeake]. Their guy has been in Hong Kong 30 days working on the closing.  They are hoping sooner than later.  As soon as I hear anything further [regarding payment to Chesapeake] **I'll let you know ASAP**.  Thanks. Cole Kimball.

**Exhibit L** (emphasis added).

61.     On January 14, 2014, Defendants continued to make misrepresentations in furtherance of their agreement, scheme and conspiracy to defraud Chesapeake, as Cole represented:

> Still circling the airport. [Del and/or Defendants] **Says it's going to happen** [i.e., payment to Chesapeake].  Cole Kimball.

**Exhibit M** (emphasis added).

62.     On behalf all Defendants and pursuant to Defendants' agreement, scheme and conspiracy, Cole continued to make numerous misrepresentations regarding payment to Chesapeake. These misrepresentations were false, known to be false when made, and stated with the specific intent to harm Chesapeake, to prevent Chesapeake from representing Defendants' competitors and to induce Chesapeake to undertake additional work to benefit Defendants.

63.     Defendants made a multitude of other misrepresentations, verbally and in writing, from July 2, 2012 through May 1, 2014. Those representations are incorporated by reference.

64.     Defendants' misrepresentations were made for the purpose of executing their scheme and these misrepresentations are a pattern of racketeering activity.

65.     Defendants fraudulently extracted and obtained benefits and proceeds from Chesapeake through their pattern of conduct, but those benefits and proceeds were not solely directed to benefit OCN. Rather, in addition, Defendants primarily directed the benefits and proceeds obtained from Chesapeake toward other separate enterprises, investments, holding companies and investment vehicles that Defendants owned, controlled or operated in the United States and in foreign countries such as Evergreen Capital Partners, LLC, other hedge funds, and other payday loan operating companies, holding companies or affiliated entities.

605910 v5

66.     The enterprises described herein, including, but not limited to investments, holding companies and investment vehicles that Defendants owned, controlled or operated in the United States and in foreign countries such as Evergreen Capital Partners, LLC, other hedge funds, and other payday loan operating companies, holding companies or affiliated entities, are separate and apart from the predicate activities and pattern of conduct effectuated by Defendants. These enterprises are ongoing organizations that functioned as continuing units with a common purpose. These enterprises operated in the United States, the United Kingdom, Russia and Mexico. Upon information and belief, Defendants operated the payday loan enterprises in other foreign countries in addition to the United Kingdom, Russia and Mexico.

67.     Beginning around mid-2014, Defendants modified their tactics in furtherance of their scheme, agreement and conspiracy to defraud and harm Chesapeake. Defendants' new tactic was evasion of communication with Chesapeake.

68.     On April 1, 2014, Chesapeake wrote to Cole offering to step aside and terminate the engagement.  **Exhibit N.**  Defendants did not respond.

69.     On May 1, 2014, Chesapeake wrote another letter to Cole outlining Defendants' failure to make payments. **Exhibit O.**  Defendants did not respond.

70.     On June 1, 2014, Chesapeake wrote a third letter to Cole describing how Defendants' failure to make payments has been disruptive to Chesapeake's business. **Exhibit P.** Defendants did not respond.

71.     Throughout the entire course of the parties' relationship, Defendants never cancelled, revoked, terminated or disavowed the parties' contractual and commercial relationship. Defendants never served a written 30 day cancellation notice of the parties' contractual agreement.

605910 v5

72.     At various times, Defendants represented that alleged financial problems were the reason for non-payment. However, Defendants did not provide evidence of actual financial problems. Upon information and belief, Defendants continued to travel abroad extensively and utilize private Gulfstream jets for their domestic travel.

### D.   Detailed Factual Basis for Personal Liability against Cole and Del Based on Veil-Piercing, Alter-Ego Liability and Dissolved Corporate Form

73.     Cole and Del should be held liable for obligations attributed to OCN under veil-piercing and alter-ego theories. Cole and Del should also be held liable for obligations attributed to OCN because OCN is a dissolved, inactive corporate form and OCN is therefore a nullity.

74.     Cole and Del exercised complete and pervasive dominion and control over shell entity OCN with respect to OCN's finances and operations, including all transactions pertaining to Chesapeake. Cole and Del used that control over OCN to commit a wrong against Chesapeake, which resulted in Chesapeake's injury and damages. Therefore, the corporate veil should be pierced, making Cole and Del individually responsible and liable for OCN's debts and obligations to Chesapeake.

75.     As a corporate form, OCN has been abused and used as a subterfuge. To observe OCN as a stand-alone corporate form in this context would work an injustice on Chesapeake. Cole and Del have complete dominance and control over OCN and they used OCN as a mere instrumentality in the transaction with Chesapeake. Cole and Del used OCN as a mere instrumentality to defraud Chesapeake out of payment and to further their own personal interests, business interests and affairs. There is such a unity of interest and ownership of OCN that the separate personalities of OCN and Cole and Del do not exist. OCN is a corporate fiction; to allow it to persist would promote injustice and protect fraud.

605910 v5

76.     OCN is not in good standing, it is defunct, it is undercapitalized, it is a shell, it is a sham, and it is a mere instrumentality of Cole and Del.

77.     A "separate personality" of OCN as a corporate entity was virtually non-existent from OCN's inception and OCN's personality diminished further over time. Presently, OCN is a legal nullity, as it is deactivated and not in good standing.

78.     OCN does not have and never had a legitimate "principal office," as OCN's principal location is Cole's residence located at 725 S. Emerson Street, Denver, CO 80209.

79.     No persons other than Cole and Del were involved with the ownership, management or operations of OCN and OCN had no employees or independent contractors working for it other than Cole and Del.

80.     OCN filed only one timely annual report and was deactivated three times by the Colorado Secretary of State for failing to adhere to the most minimal and basic formalities of corporate compliance. After OCN's final deactivation, OCN was never revived and OCN is presently inactive and not in good standing.

81.     On February 24, 2009, Cole formed OCN by filing articles of incorporation.  The articles of incorporation are paper-thin and extremely rudimentary in nature. The articles of incorporation contain no substantive information at all regarding OCN as a separate entity.

82.     On June 18, 2010, OCN filed its only timely annual report. The June 18, 2010 annual report contained no substantive information regarding OCN's business.

83.     On April 30, 2011, OCN's 2011 annual report was due, but OCN did not file an annual report when it was due.

84.     On May 1, 2011, the Colorado Secretary of State noted OCN's failure to file an annual report.

85.     On June 1, 2011, the Colorado Secretary of State mailed notification of OCN's failure to file an annual report. OCN declined to respond.

86.     On August 1, 2011, OCN became delinquent for its failure to file an annual report.

87.     On August 25, 2011, OCN filed a statement curing delinquency.

88.     On October 31, 2012, OCN's 2012 annual report was due, but again OCN did not file an annual report when it was due.

89.     On November 1, 2012, OCN again became non-compliant for its failure to file an annual report.

90.     On January 1, 2013, OCN again became delinquent for its failure to file an annual report.

91.     On January 8, 2013, OCN filed a statement curing delinquency.

92.     On March 31, 2014, OCN's annual report was due, but for a third time, OCN did not file an annual report when it was due.

93.     On April 1, 2014, OCN became non-compliant, a third time, for its failure to file an annual report.

94.     On May 31, 2014, OCN became delinquent, a third time, for its failure to file an annual report.

95.     OCN has not filed a statement curing its delinquency and OCN presently remains delinquent, inactive and not in good standing. **Exhibit K.**

96.     OCN intentionally allowed itself to become delinquent and inactive due to the sheer neglect of corporate formalities and failure to perform the minimal level of corporate duties.

97.     Corporate formalities pertaining to OCN were ignored or virtually non-existent from beginning of OCN's existence, amid its multiple instances of deactivation, and through its ultimate dissolution. Cole and Del regularly used their personal email addresses or other email addresses to conduct business with Chesapeake. For example, Cole used the following email address to conduct business with Chesapeake: ckimball3388@comcast.net. In addition, Cole used a signature block reflecting "Maxwell Marketing, Inc." to conduct business with Chesapeake. Maxwell Marketing, Inc. is also located in Cole's residence. Cole used his personal ckimball3388@comcast.net email address to make misrepresentations to Chesapeake regarding the timeframe for Chesapeake's receipt of payment.

98.     Del did not use an OCN email address in his dealings with Chesapeake, and instead used the following email address: dkimball@ltsmanagement.com. Moreover, Del conducted business with Chesapeake directly for his own business interests or through other companies such as Evergreen Capital Partners, LLC and LTS Management, rather than OCN.

99.     OCN was never properly funded or capitalized. OCN never earned money or operated as an independent, sustained enterprise. OCN never functioned as a stand-alone entity. Defendants' payments to Chesapeake were orchestrated by Cole and Del through their various lucrative business enterprises rather than through the OCN as a stand-alone entity. Upon information and belief, OCN's funds and assets were commingled with Cole and Del's personal accounts and/or Cole and Del's other business accounts or holding entities.

100.    Cole and Del maintained complete dominion and control over OCN and OCN was a mere instrumentality of Cole and Del. No decision-making function pertaining to any matter involving OCN was vested in any person other than Cole and Del as Cole and Del exhibited complete domination and control over OCN.

- 18 -

101.    OCN does not maintain adequate corporate records.  Upon information and belief, OCN did not ever hold a single shareholder meeting. Because no shareholder meetings took place, no meeting minutes exist. Because no shareholder meetings took place, no records of any corporate resolutions exist. Upon information and belief, OCN's bylaws and operating agreement are non-existent or disregarded and OCN does not maintain a separate insurance policy. Upon information and belief, OCN does not keep records of capital contributions.

102.    OCN is a mere instrumentality, particularly as it relates to the transaction of defrauding Chesapeake out of its $25,000 monthly retainer fees. Chesapeake's services benefitted Cole and Del in their own separate business affairs that were distinct from OCN. There is such unity of interest in ownership of OCN such that the separate personalities of OCN and Cole and Del do not exist. The corporate form of OCN is a mere shell lacking any substantive content, OCN is thinly capitalized, or not capitalized at all.

103.    The nature and form of OCN's ownership and control facilitates misuse by Cole or Del, the insiders, because OCN is completely dominated by Cole and Del, virtually no corporate formalities were observed, OCN is not in good standing, OCN has always been inadequately capitalized, OCN was a shell designed to defraud Chesapeake out of $25,000 monthly retainer fees, and Chesapeake's services resulted in benefits to Cole and Del, rather than OCN.

104.    OCN, which is defunct, was a corporate fiction used by Cole and Del to wrongfully perpetrate a fraud on Chesapeake by defrauding Chesapeake out of payment for services that Chesapeake performed. OCN was also a corporate fiction used by Cole and Del in an attempt to defeat Chesapeake's rightful claim for payment of services rendered.

105.    Cole and Del intentionally orchestrated the dissolution and demise of OCN with the wrongful intent to evade making payment to Chesapeake for services that Chesapeake performed.  The actual beneficiaries of Chesapeake's services were Cole and Del. OCN did not maintain the most minimal level of existence, as it filed only one timely annual report and was deactivated three times.

106.    Under the principles of equity and justice, OCN's corporate form should be disregarded under a veil-piercing and/or alter-ego theory. Cole and Del should be held liable for the obligations that OCN owes Chesapeake because the result achieved by disregarding the corporate form and holding Cole and Del personally liable for the acts of OCN is an equitable one.

107.    Moreover, Cole and Del, as owners of OCN, should be directly personally liable for the obligations of OCN because OCN is a dissolved, defunct entity.

108.    Chesapeake pleads all counts against OCN in its corporate capacity. Chesapeake pleads all counts against Cole and Del pursuant to all of the following theories, which are all hereby pled in each count in the alternative: (1) personal liability for Cole and Del, jointly and severally, based on their direct actions and/or engagement with Chesapeake; (2) personal liability for Cole and Del, jointly and severally, based on a veil-piercing theory, in that OCN's corporate form should be disregarded and Cole and Del should be held personally liable for OCN's obligations to Chesapeake; (3) personal liability for Cole and Del, jointly and severally, based on an alter-ego theory, in that OCN's corporate form should be disregarded and Cole and Del should be held personally liable for OCN's obligations to Chesapeake; and, (4) personal liability for Cole and Del, jointly and severally, based on the fact that OCN is delinquent, inactive, deactivated, dissolved, not in good standing and therefore a nullity under the law, and

605910 v5

accordingly OCN's corporate form should be disregarded and Cole and Del should be held personally liable for OCN's obligations to Chesapeake. All four theories of liability against Cole and Del, jointly and severally, are hereby pled as described in this paragraph in each count below as if fully set forth in each applicable instance. In addition, all Defendants are individually, jointly, and severally liable pursuant to the Racketeer Influenced and Corrupt Organization Act (RICO) claim as set forth in Count Seven.

### COUNT ONE – BREACH OF CONTRACT AGAINST ALL DEFENDANTS

109.    Chesapeake incorporates by reference all the allegations contained in the preceding paragraphs of this Complaint as if fully set out herein.

110.    Chesapeake and Defendants entered into a valid, binding, enforceable contract or contracts for services.

111.    Defendants agreed to the contractual terms whereby Chesapeake would render services for a flat fee of $25,000 per month.

112.    Defendants additionally and/or alternatively accepted the contract or contracts by performance. Defendants are estopped from denying the enforceability of the contract or contracts because Defendants accepted the contractual terms by words, and/or actions and/or performance.

113.    Chesapeake fully performed its contractual obligations.

114.    Chesapeake has satisfied all conditions precedent.

115.    Defendants never terminated the parties' contractual agreement or agreements.

116.    Defendants breached the contract or contracts by failing to make payment in the amount of $25,000 per month for the 23 months from July 2, 2012 through May 1, 2014. The total amount Defendants owe is $575,000.

605910 v5

117. Defendants' failure to pay $575,000 is a breach of Defendants' contractual obligations.

118. As a direct and proximate cause of Defendants' breach, Chesapeake has incurred actual damages in the amount of $575,000.

119. As a result of Defendants' breach, Defendants owe prejudgment interest on the amount of $575,000.

120. The parties' contractual agreement contains a provision for Chesapeake's recovery of attorney's fees.

121. As a result of Defendants' breach, Defendants owe Chesapeake attorney's fees and costs of collection in an amount to be determined.

## COUNT TWO – QUANTUM MERUIT/UNJUST ENRICHMENT AGAINST ALL DEFENDANTS

122. Chesapeake incorporates by reference all the allegations contained in the preceding paragraphs of this Complaint as if fully set out herein.

123. Count Two is hereby pled in the alternative to Count One pursuant to F.R.C.P. 8(a)(3), F.R.C.P 8(d)(2) and/or F.R.C.P 8(d)(3).

124. At all relevant times, Defendants had a duty and/or made a promise to pay Chesapeake all amounts due for services at Chesapeake's standard and customary rates.

125. At all relevant times herein, Chesapeake conferred a benefit by providing Defendants with valuable services.

126. Defendants had knowledge of the benefit that Chesapeake conferred.

127. Defendants voluntarily accepted, retained, appreciated and received the benefit of the services that Chesapeake provided to Defendants, at the expense of Chesapeake.

128. Defendants were enriched by the services provided by Chesapeake.

605910 v5

129.     Despite the receipt of such enrichments, Defendants refused to make full payment to Chesapeake for the enrichment received.

130.     Defendants' enrichment is unjust.

131.     The circumstances render Defendants' retention of the benefit inequitable unless Defendants pay Chesapeake the value of the benefit.

132.     As a result of Defendants' unjust enrichment, Chesapeake incurred actual damages in the amount of at least $575,000.

133.     As a result of Defendants' unjust enrichment, Defendants owe prejudgment interest on the amount of at least $575,000.

134.     As a result of Defendants' unjust enrichment, Defendants owe Chesapeake attorney's fees and costs of collection in an amount to be determined.

## COUNT THREE – PROMISSORY ESTOPPEL
## AGAINST ALL DEFENDANTS

135.     Chesapeake incorporates by reference all the allegations contained in the preceding paragraphs of this Complaint as if fully set out herein.

136.     Count Three is hereby pled in the alternative to Count One pursuant to F.R.C.P. 8(a)(3), F.R.C.P 8(d)(2) and/or F.R.C.P 8(d)(3).

137.     Defendants made a promise or promises to Chesapeake.

138.     Defendants knew or reasonably should have expected that the promise or promises would induce action or forbearance by Chesapeake as a result of the promise or promises.

139.     Chesapeake actually relied and reasonably relied on the promise or promises to Chesapeake's detriment.

140.     To prevent injustice, Defendants' promise or promises should be enforced.

141.    As a result of Defendants' promises or promises, Chesapeake incurred actual damages of at least $575,000.

142.    As a result of Defendants' promises or promises, Defendants owe prejudgment interest on the amount of at least $575,000.

143.    As a result of Defendants' promises or promises, Defendants owe Chesapeake attorney's fees and costs of collection in an amount to be determined.

## COUNT FOUR – FRAUDULENT MISREPRESENTATIONS
## AGAINST ALL DEFENDANTS

144.    Chesapeake incorporates by reference all the allegations contained in the preceding paragraphs of this Complaint as if fully set out herein.

145.    Defendants made false representations of material fact to Chesapeake.

146.    Defendants were aware of the falsity of the representations at the time they were made. The representations were willful, intentional and undertaken with malice and in bad faith. Defendants' repeated false misrepresentations evinces gross fraud, were extreme and outrageous and made with a wanton and reckless disregard and callous indifference for Chesapeake's rights.

147.    Defendants made the false representations for the purpose of intentionally defrauding and deceiving Chesapeake and inducing Chesapeake to take action it otherwise would not have taken.

148.    Chesapeake relied upon the misrepresentations and Chesapeake had a right to rely upon them in the full belief of the truth of the misrepresentations. Chesapeake was justified in relying upon the truth of the misrepresentations.

149.    At a bare minimum, Defendants were aware that they did not know whether the representation or representations were true or false.

150.     Chesapeake would not have taken actions which resulted in harm and damages to Chesapeake, if not for Defendants' misrepresentations.

151.     Chesapeake suffered actual damages of at least $575,000 directly resulting from reliance on Defendants' fraudulent misrepresentations.

### COUNT FIVE – NEGLIGENT MISREPRESENTATIONS AGAINST ALL DEFENDANTS

152.     Chesapeake incorporates by reference all the allegations contained in the preceding paragraphs of this Complaint as if fully set out herein.

153.     In course of Defendants' business, profession or employment, Defendants made misrepresentations of material fact.

154.     Defendants' misrepresentations were made without reasonable care for the guidance of Chesapeake in business transactions.

155.     Defendants had knowledge that their representations would be relied upon by Chesapeake.

156.     Chesapeake did rely on Defendants' misrepresentations to Chesapeake's detriment.

157.     Chesapeake suffered actual damages of at least $575,000 directly resulting from reliance on Defendants' negligent misrepresentations.

### COUNT SIX – CIVIL CONSPIRACY AGAINST ALL DEFENDANTS

158.     Chesapeake incorporates by reference all the allegations contained in the preceding paragraphs of this Complaint as if fully set out herein.

159.     Cole, Del and OCN formed an agreement to implement an unlawful scheme designed to harm Chesapeake.

160.     Cole, Del and OCN's agreement consisted of an object to be accomplished.

161.    Cole, Del and OCN had a meeting of the minds on the object or course of action.

162.    Cole, Del and OCN engaged in one or more unlawful overt acts in furtherance of the agreement and the scheme.

163.    As a proximate cause and result of Cole, Del and OCN's scheme and unlawful acts, Chesapeake sustained actual damages of at least $575,000.

## COUNT SEVEN – RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT (RICO) VIOLATION AGAINST ALL DEFENDANTS

164.    Chesapeake incorporates by reference all the allegations contained in the preceding paragraphs of this Complaint as if fully set out herein.

165.    This claim is brought against each Defendant individually as a primary violator, as an aider and abettor, and as a co-conspirator.

166.    In violation of 18 U.S.C. § 1961, *et seq*., Defendants Cole, Del and OCN, have knowingly and unlawfully conducted or participated, directly or indirectly, in an enterprise or enterprises concerning other entities owned or controlled by Defendants, including but not limited to Evergreen Capital Partners, LLC, other investment companies related to payday loans, other hedge funds related to payday loans or payday loan businesses, investment companies pertaining to payday loans, hedge fund operating companies related to payday loans, other payday loan businesses, corporations, LLCs, trade names, investment funds, investment fund operating companies related to payday loans, payday loan companies, payday loan operating companies, holding companies related to payday loans, management companies related to payday loans, and/or other affiliated entities related to Defendants' payday loan businesses, in the United States, in foreign countries, including but not limited to Russia, the United Kingdom and Mexico, through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), including acts of mail fraud and wire fraud, within the meaning of meaning of 18

U.S.C. § 1341 and 18 U.S.C. § 1343, as alleged herein; Defendants' predicate acts described throughout this Complaint were undertaken to further the fraudulent scheme of obtaining Chesapeake's expertise and services without making payment, including defrauding Chesapeake, by avoiding payment of over $575,000 in services, and by inducing Chesapeake to continue to provide services to Defendants, to further the enterprise or enterprises consisting of other entities owned or controlled by Defendants, through Defendants' series of intentionally false representations, promises, contract breaches and deceit.

167.    Defendants engaged in a pattern of racketeering activity through their repeated acts of wire fraud and mail fraud within the past ten (10) years.

168.    Defendants were employed by or associated with an enterprise or enterprises, the activities of which affect interstate or foreign commerce. Defendants conducted or participated, directly or indirectly, in the actions and conduct of the enterprise or enterprises' affairs through a pattern of racketeering activity.

169.    At all relevant times, Defendants' actions occurred within a "state" as defined in 18 U.S.C. § 1961(2).

170.    At all relevant times, each of the Defendants was a "person" within the meaning of 18 U.S.C. § 1961(3), as each Defendant was capable of holding a legal or beneficial interest in property.

171.    At all relevant times, each of the Defendants owned, operated and/or controlled an "enterprise" within the meaning of 18 U.S.C. § 1961(4), which includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. Those enterprises were owned and operated in the United States and in foreign countries.

605910 v5

172.   At all relevant times, each of the Defendants engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), in that Defendants engaged in at least two acts of racketeering activity.

173.   Defendants executed their scheme through mail fraud and wire fraud, within the meaning of meaning of 18 U.S.C. § 1341 and 18 U.S.C. § 1343. Defendants used the United States mails as well as transmissions by interstate-wire, email, telephone, and by use of the internet, in interstate commerce.

174.   Defendants had a scheme to defraud Chesapeake, Defendants knowingly participated in that scheme and Defendants used the mail or wires in furtherance of that scheme.

175.   Defendants made a false representation or representations of material fact or a material omission.

176.   Defendants knew or believed the representation or representations to be false.

177.   Defendants made the false representation, representations, omission or omissions with the intent to induce Chesapeake to rely upon the false representation, representations, omission or omissions.

178.   Chesapeake took action or forbearance in reliance on the false representation, representations, omission or omissions.

179.   Defendants' predicate acts were the proximate cause of damages sustained by Chesapeake.

180.   Chesapeake sustained actual damages in reliance of the false representation, representations, omission or omissions.

605910 v5

181.   Defendants also engaged in "promissory fraud," in that Defendants made promises to perform an act or acts in the future. At the time of making the promise or promises, Defendants had no intention of ever performing the future act.

182.   Defendants' predicate acts, including but not limited to their pattern of making false promises, were a scheme and device used to accomplish the independent fraudulent scheme of extracting information, benefits and intelligence from Chesapeake to invest in their other business enterprises in the United States and in foreign countries.

183.   Defendants' predicate acts had the same or similar purposes, results, participants, victims, methods of commission and are not isolated events.

184.   Defendants invested the proceeds of the pattern of racketeering activity into an enterprise or enterprises in the United States and in foreign countries. Those enterprises include, but are not limited to investments, holding companies and investment vehicles that Defendants owned, controlled or operated in the United States and in foreign countries such as Evergreen Capital Partners, LLC, other hedge funds, and other payday loan operating companies, holding companies or affiliated entities.

185.   Defendants acquired or maintained an interest in, or control over, the enterprise or enterprises through the pattern of racketeering activity. Defendants conducted or participated in the affairs of the enterprise or enterprises through the pattern of racketeering activity. Moreover, Defendants conspired to do all of the above.

186.   Upon information and belief, Defendants obtained and generated substantial amounts of revenue and profit from the enterprises described herein. Upon information and belief, Defendants engaged in surreptitious accounting techniques in connection with their conduct.

187.   Each Defendant conspired to violate 18 U.S.C. § 1962(a), in violation of 18 U.S.C. § 1962(d),

188.   As a result of Defendants' actions, Chesapeake suffered actual damages of at least $575,000. Chesapeake seeks those damages, trebled pursuant to 18 U.S.C. § 1964(c), in the amount of at least $1,725,000.

189.   As a result of Defendants' actions. Defendants owe Chesapeake reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c) in an amount to be determined.

WHEREFORE Chesapeake prays that this Court enter a judgment on the Complaint as follows:

A.   Chesapeake respectfully requests that the Court enter judgment for compensatory damages against all Defendants, jointly and severally, pursuant to Count One (Breach of Contract) in the principal amount of $575,000;

B.   Chesapeake respectfully requests that the Court enter judgment for compensatory damages against all Defendants, jointly and severally, pursuant to Count Two (Quantum Meruit/Unjust Enrichment) in the principal amount of at least $575,000;

C.   Chesapeake respectfully requests that the Court enter judgment for compensatory damages against all Defendants, jointly and severally, pursuant to Count Three (Promissory Estoppel) in the principal amount of at least $575,000;

D.   Chesapeake respectfully requests that the Court enter judgment for compensatory damages against all Defendants, jointly and severally, pursuant to Count Four (Fraudulent Misrepresentations) in the amount of at least $575,000;

605910 v5

E.      Chesapeake respectfully requests that the Court enter judgment for compensatory damages against all Defendants, jointly and severally, pursuant to Count Five (Negligent Misrepresentations) in the amount of at least $575,000;

F.      Chesapeake respectfully requests that the Court enter judgment for compensatory damages against all Defendants, jointly and severally, pursuant to Count Six (Civil Conspiracy) in the amount of at least $575,000;

G.      Chesapeake respectfully requests that the Court enter judgment for compensatory damages, trebled, against all Defendants, jointly and severally, pursuant to Count Seven (RICO) in the amount of at least $1,725,000;

H.      Chesapeake respectfully requests that the Court award punitive damages against all Defendants, jointly and severally, pursuant to Count Three (Fraudulent Misrepresentations);

I.      Chesapeake respectfully requests that the Court award reasonable attorney's fees, against all Defendants, jointly and severally, pursuant to Count Seven (RICO);

J.      Chesapeake respectfully requests that the Court award all costs, reasonable attorney's fees and prejudgment interest against all Defendants, jointly and severally; and,

K.      Chesapeake respectfully requests that the Court grant such other and further relief that the Court finds just and proper.

## JURY DEMAND

Chesapeake respectfully demands a trial by jury on all counts.

Dated: December 31, 2014

Respectfully submitted,

605910 v5

SHOOK, HARDY & BACON, LLP


By:   s/ Richard G. Sander
      Richard G. Sander
      Kali R. Backer
      Shook, Hardy & Bacon LLP
      1660 17th Street, Suite 450
      Denver, CO 80202
      Telephone:  (303) 285-5303
      Facsimile:  (303) 285-5301
      Email: rsander@shb.com
      Email: kbacker@shb.com

      Kenneth E. Chase
      Shook, Hardy & Bacon LLP
      1155 F Street NW, Suite 200
      Washington, DC 20004
      Telephone:  (202) 639-5606
      Facsimile:  (202) 783-4211
      Email: kchase@shb.com

      *Counsel for Plaintiff*
      *Chesapeake Enterprises, Inc.*

605910 v5